**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| _____ | ) | |
| **George Wilson** | ) | |
|  | ) | |
| **Plaintiff** | ) | |
|  | ) | |
| **v.** | ) | **Docket No. 1:13-cv-00129-LM** |
|  | ) | |
| **Port City Air, Inc.** | ) | |
|  | ) | |
| **Defendant** | ) | |
|  | ) | |
| _____ | ) | |

**AFFIDAVIT OF EXPERT WITNESS JULIE A. MOORE**

I, Julie A. Moore, being under oath, swear and depose as follows:

**EXPERIENCE, QUALIFICATIONS AND EXPERTISE OF AFFIANT**

1.  My name is Julie A. Moore, Esq., SPHR, and I am the president of Employment Practices Group ("EPG"), a legal and Human Resources consulting firm founded in 1998.  I am an attorney admitted to practice law in the Commonwealth of Massachusetts and State of New Hampshire and have practiced law for twenty-two (22) years.

2.  I hold a Senior Professional in Human Resources (SPHR) certification through the HR Certification Institute, an internationally recognized certifying organization for the Human Resource profession.

3.  Much of my work with EPG is as an independent factfinder, where I conduct investigations for employers into alleged harassment and other forms of misconduct in the workplace.  I have conducted over 100 investigations and have also acted as legal counsel to employers handling matters internally. Also, I routinely provide employers with workplace training and

1

workshops on a variety of topics, including sexual harassment, unlawful harassment,

discrimination, the ADA, FMLA, diversity, conducting investigations, workplace violence,

hiring and firing, performance management and other workplace issues.

4. For a complete description of my qualifications and experience I have attached my

   *curriculum vitae* as Exhibit 1.

5. A list of my publications is attached hereto as Exhibit 2.

6. A list of my speaking engagements is attached hereto as Exhibit 3.

7. Over the past four years I have testified, by deposition or at trial, as an expert witness in eight

   (8) employment-related litigation matters.

8. The declaration of expert opinion in this case is based upon my personal knowledge

   grounded in a thorough and complete review of the documents described below, the

   pleadings filed in connection with this matter, and other documents produced during

   discovery in this matter as well as a six (6) hour interview of George Wilson on October 4,

   2013.

9. I can and will testify in the instant case regarding my expert opinion should that be requested

   or required. If called upon as an expert witness in this matter I could and would competently

   testify to the facts and opinions contained herein.

## DOCUMENTS REVIEWED

10. In connection with this matter I have reviewed the following:

    a. Excerpts from the Deposition of Ned Denney (Excerpts attached as Exhibit 4);

    b. Port City Air's Employee Handbook (Excerpts Attached as Exhibit 5);

    c. Affidavit of Adam Clark;

d.  January 16, 2012 Memorandum to all employees from Bob Jesurum regarding
    "Harassment -- Please post" and Policy 803 Sexual and Other Unlawful
    Harassment (Attached as Exhibit 6);

e.  Excerpts from the Deposition of George Wilson;

f.  Color photograph of noose near cubby/mailbox;

g.  Color photograph of noose hanging from ceiling;

h.  George Wilson's personnel file;

i.  Select pleadings and other documents exchanged during discovery in this matter;

j.  EEOC  Guidance, including but not limited to its "Enforcement Guidance:
    Vicarious Employer Liability for Unlawful Harassment by Supervisors," No.
    915.002, 6/18/99[1] citing *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257
    (1998), and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998)  and its
    Enforcement Guidance entitled "Policy Guidance on Current Issues of Sexual
    Harassment," No. 915.050, 3/19/90 and last reformatted 6/28/10;[2] both are widely
    cited and relied on by employers, Human Resources professionals and workplace
    investigators as practical guides for both preventing harassment and
    discrimination in the workplace and for conducting a proper workplace
    investigation; and

k.  Documents and articles from:

    i.  The Society for Human Resources Management ("SHRM"), the world's
        largest professional association devoted to Human Resource management

---

[1] Available at http://www.eeoc.gov/policy/docs/harassment.html.

[2] Available at http://www.eeoc.gov/eeoc/publications/upload/currentissues.pdf.

and an organization of which I am a member, which is a key authority relied upon in articulating industry "best practices" for the handling of employer-employee issues in all aspects of Human Resources as well.

   ii.  Business and Legal Resources ("BLR"), an acknowledged authority providing updated coverage of state and federal laws and industry standards on a variety of workplace matters. BLR's business and legal resources are prepared by lawyers and industry experts for the business world so that organizations can have access to appropriate tools and resources for compliance.

  iii.  The Association of Workplace Investigators ("AWI"), which is a professional organization designed to promote and enhance workplace investigations, and is a resource for the proper conduct of investigations, and is a resource that sets forth best practices standards for investigating workplace misconduct.[3]

## SUMMARY OF OPINIONS

11. My evaluation of the employer's actions is based on whether Port City Air (hereinafter "PCA" the "Company") adhered to and followed its own policies and industry standards , as articulated in the sources described above and other sources mentioned in the report that I submitted.

12. In the report that I submitted, I outlined my opinions as follows:

---

[3] I am a member of the Board of Directors, have been a speaker at the AWI annual conference, and have served as the  conference chair of the AWI annual conferences in 2012, 2013 and will serve again in 2014. I have published in the AWI quarterly, which is a peer-reviewed publication.

    a.  The Company failed to implement preventative measures or good-faith efforts to prevent discrimination or its recurrence contrary to sound employment practices and its own policy.

        i.  The Company failed to properly communicate its anti-harassment policy.

       ii.  The Company failed to train employees and managers on its anti-harassment policy.

     iii.  The anti-harassment policy is deficient.

     iv.  The Company fostered or tolerated a culture where employees at all levels acted inappropriately.

    b.  The Company failed to implement appropriate corrective measures contrary to sound employment practices and its own policy.

        i.  The Company should have acted once it was on notice of racial remarks and the noose incident.

       ii.  The "investigation" lacked thoroughness.

     iii.  The remedial action taken was insufficient.

     iv.  PCA failed to warn employees about retaliation.

**ANALYSIS**

*Background Facts*

13. Based on my review of the documents, I have the following understanding of the facts.

14. Port City Air, Inc. hired George Wilson in January of 2008 to work as a Line Service Technician.

15. As a Line Service Technician, George was responsible for working with private and commercial aircraft. He described his job duties to include the following: moving, parking,

refueling, cleaning, and de-icing privately owned aircraft at Portsmouth International Airport
at Pease.  In addition, he provided customer service to PCA's customers, which included
assisting customers with exiting and entering aircraft as well as loading and unloading
baggage.  He worked alongside Maintenance employees.

16. The two (2) top executives at the Company were Ned Denney, Chief Executive Officer, and
Robert Jesurum, President.

17. Adam Clark was a Line Service Technician who worked at Port City Air alongside George
Wilson.

18. John Andrews was a Line Service Manager who supervised George between November 28,
2011 and February 6, 2012.  He reported directly to Ned Denney.

*Overview of the Work Environment and Racial Harassment*

19. George Wilson claims that several employees, including Adam Clark, subjected him to a
number of racial names and other disparaging conduct.  Among other things, George heard
the words "nigger," "black bastard," "boy," and "brother" in the workplace.  He was also the
target of racially-charged jokes on many occasions.  Some of these racially-offensive words
were said to George directly and, at other times, they were said outside of his presence.
George was deeply offended and upset at the hostile work environment that he was subjected
to, which included inappropriate comments by his manager, John Andrews.

20. In January 2008, George reported to one supervisor, Scott (last name unknown), about a
racially-offensive picture of Barack Obama as well as an employee using the "N word" to
him. It does not appear that this employee ever reported the matter further to the President or
CEO.

21. One particularly severe incident occurred on November 8, 2011, when two (2) nooses were placed in the line office.  That is, George discovered a noose knot tied to the light fixture hanging from the ceiling and a second was near his mail cubby.  I reviewed color photographs of the same which confirm the existence and placement of the noose knots, as well as the date of the incident.

22. During his tenure with the Company, George indicated that he had never received or reviewed any PCA policy relating to unlawful harassment.  The Company never distributed the policy either as a standalone document or through its Employee Handbook.  It never did any training or education about the policy or its position about racial harassment.

*Opinions*

    A.    <u>*The Company Failed to Implement Preventative Measures or Good-Faith Efforts to Prevent Discrimination or its Recurrence Contrary to Sound Employment Practices and Its Own Policy*</u>

23. Employers are obligated to implement reasonable preventative measures to prevent discrimination, which includes harassment, from occurring. The EEOC underscores employers' critical role in preventing workplace harassment and its recurrence:

> "Prevention is the best tool to eliminate harassment in the workplace. Employers are encouraged to take appropriate steps to prevent and correct unlawful harassment. They should clearly communicate to employees that unwelcome harassing conduct will not be tolerated. They can do this by establishing an effective complaint or grievance process, providing anti-harassment training to their managers and employees, and taking immediate and appropriate action when an employee complains. Employers should strive to create an environment in which employees feel free to raise concerns and are confident that those concerns will be addressed."

See http://www.eeoc.gov/laws/practices/harassment.cfm

24. In its "Policy Guidance on Current Issues of Sexual Harassment," the EEOC states:

> "An effective preventive program should include an explicit policy against sexual harassment that is clearly and regularly communicated to employees and effectively implemented. The employer should affirmatively raise the subject with all supervisory and non- supervisory employees, express strong disapproval, and explain the sanctions for harassment. The employer should also have a procedure for resolving sexual harassment complaints. The procedure should be designed to "encourage victims of harassment to come forward" and should not require a victim to complain first to the offending supervisor. *See Vinson*, 106 S. Ct. at 2408.  It should ensure confidentiality as much as possible and provide effective remedies, including protection of victims and witnesses against retaliation."

25. Certainly the same principles relating to sexual harassment apply to harassment based on other legally-protected categories as well.

26. Reasonable preventative measures, therefore, include maintaining a legally-compliant, comprehensive, and effective unlawful harassment policy.  The policy must be distributed to all employees.  Employees, including management representatives, must understand and comply with the policy.  Managers and supervisors are the role models and set the standard for others to follow.  Training is the most effective way to communicate an organization's policy and its meaning to all employees, from the top on down.

27. SHRM articulates employer best practices in preventing workplace harassment in its article entitled "Preventing Unlawful Workplace Harassment" (February 2012):

> In response to the multiplicity of antidiscrimination laws, regulations and court decisions spelling out the nuances of what constitutes unlawful harassment and refining the scope of employer liability for it, organizations are advised to develop, communicate and enforce policies and practices to prevent, investigate and remedy prohibited behavior.

28. Instructive to the consideration of whether an employer has upheld its responsibility to prevent harassment or its recurrence is the Notice posted on the EEOC website alongside its EEOC Compliance Manual Section 15: Race and Color Discrimination (and other Guidance documents on its website).  In this publication, entitled "A Notice Concerning the Supreme

8

Court's Decision in *Vance v. Ball State University*, 133 S. Ct. 2434 (2013)," the EEOC articulates the Court's ruling that an employer is liable for hostile work environment harassment by employees who are not supervisors if the employer was "negligent in failing to prevent harassment from taking place." The EEOC Notice further emphasizes that, in assessing such negligence, relevant evidence includes a showing "that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed."

29. As discussed in further detail below, PCA failed to take reasonable preventative measures to effectuate its policy by educating its workforce about what its harassment policy meant, how to recognize harassment in the workplace, to whom a harassment complaint should be brought, or what to do when harassment was reported or otherwise became known. The Company also failed to adhere to best practices in failing to have an anti-retaliation policy provision and otherwise having deficits in its policy. The Company failed to follow its policy as well by failing to train its supervisors when it expressed a commitment to do so. As a result, a culture was created where employees and managers alike engaged in harassing behavior, and managers failed to enforce the policy.

    1.  *The Company Failed to Properly Communicate Its Anti-Harassment Policy*

30. Harassment policies must be properly communicated to employees at all levels as part of an employer's good-faith, preventative measures. In its recently published guide on "How to Develop and Implement a New Company Policy" (June 2013), SHRM emphasizes the importance of effectively communicating employment policies:

    Company policies are created to establish expectations and to provide guidance on
    how to consistently handle workplace situations. Although most company policies are

not "all-encompassing," they provide direction regarding what is appropriate as well as inappropriate or unacceptable behavior.  Company policies help [employers] maintain order within the organization and ensure that [managers] treat people fairly and equally.  Policies will also help [] employees understand what is expected of them.

31. SHRM goes on to list five (5) necessary steps for policy implementation, the fourth of which is "communicate with employees."  To carry out this critical step of communicating its policies to employees, SHRM emphasizes that employers must do the following:

> Incorporate a communication method that will give employees an opportunity to ask questions about the policy.  The policy should consist of an acknowledgment statement indicating the employee's receipt and understanding of the new policy along with the effective date of the policy. Allow space for the employee's signature and date.  Add the policy to your organization's employee handbook or intranet as well as include it in your new hire orientation programs as appropriate, and notify employees where they can access this policy later (i.e., links to intranet site, attachment of policy to print to add to their employee handbook).

32. In its article entitled "EEOC and Company Sexual Harassment Policies" (March 2011), BLR underscores the need for employers to publicize their harassment policies.  As a matter of best practices, employers should:

> Make sure that all [] employees understand [the] harassment policy.  Each new hire should be given a copy of the policy and an explanation of how to file a complaint.  Also, [employers should] post a copy of the policy on [their] department bulletin board to ensure that this information is available to all employees at all times.

33. While it is undisputed that PCA maintains a handbook, dated October 1, 2005 that contains a policy on harassment, it is also clear that it was not properly communicated.  More specifically, on Page 22 of its Employee Handbook, Policy #803 entitled "Sexual and Other Unlawful Harassment" constitutes the Company's policy regarding harassment based on race, color, and other protected categories under the law. (Exhibit 6, p 22)

10

34. The documentation from George's personnel file reveals that the policy was never distributed to George.[4]  That is, no documentation exists to show that the Company provided George with a copy of the Employee Handbook at any orientation or at the time of his hire. George confirmed this fact for me.  Further, no documentation exists to show that the Company provided George with this particular harassment policy or asked him to sign an acknowledgement form. Moreover, George advised me that this policy was not posted anywhere in the workforce.  George confirmed that he never received a copy of this policy.

35. Ned Denney testified at his deposition that PCA does not require its employees to sign an acknowledgement that the employee has read the subject policy. (Denney Dep. at 74: 8). Furthermore, prior to June of 2012, PCA never conducted any training with respect to discrimination or workplace harassment. (Denney Dep. at 74: 14).

36. It was not until George was promoted to a supervisory position was he aware that the Company maintained an Employee Handbook.  He knew that a Handbook was in the file cabinet and available to him as needed.  No one, however, reviewed any policies with him or emphasized the importance of what was contained in the Handbook, including the anti-harassment policy.

37. The Company did review with George, as a new hire, certain information about the Company.  Presumably, the Company believed the information it conveyed was most important.  As a new hire, George completed an Employee Information Form, and he signed a Non-Competition Agreement (Denney Dep. at 70:13) and Drug/Alcohol Policy acknowledgement form (Denney Dep. at 70:19 – 71:8).   He also completed certain forms

---

[4] Further, the Company fell short on other workplace practices.  George never received a written job description nor did he receive an offer letter when he was hired.  This may be attributed to the fact that PCA had no HR department, which is quite unusual for a company that size.

that are legally mandated, such as a W-4 Form and I-9 Form. (Denney Dep. at 70:3).  The Company obviously thought it was more important to review issues relating to drug and alcohol rather than sexual harassment or harassment based on race and other protected categories.

    2.  *The Company Failed to Train Employees and Managers on Its Harassment Policy*

38. As previously stated, prior to June of 2012, PCA never conducted any trainings with respect to discrimination or workplace harassment. (Denney Dep. at 74: 14). Training supervisory personnel and employees is an integral part of an employer's preventative measures, consistent with best practices (and sexual harassment training is mandated by law in certain states such as California, Maine, Rhode Island and Connecticut, among others).  Training is particularly important to educate employees and managers about the policy, what it means, and how to lodge complaints.

39. A written policy will be ineffective in combating harassment unless the prohibition and obligations imposed by the policy are communicated and explained to the workforce – both employees and non-supervisory employees alike.  Training is especially important for supervisory personnel.  This is so because supervisors play a critical role in the internal complaint procedure and set the standard for appropriate workplace conduct.  As part of adequate supervisor training, the employer must instruct supervisors to recognize harassment, to refrain from engaging in it, and to address and/or report harassment complaints.  Such supervisor training must also cover retaliation.

40. In addition to supervisor training, an employer should assure that all non-management employees are advised of its harassment policy and internal complaint procedure.

Employees should be instructed about the definition of harassment, told that harassment is not tolerated under any circumstances, and advised as to how to lodge a harassment complaint.

41. SHRM emphasizes, in its above-referenced article "Preventing Unlawful Workplace Harassment:"

> Effective policy implementation is directly linked to harassment prevention training for managers and employees. Moreover, the U. S. Supreme Court's landmark decisions in *Faragher v. City of Boca Raton, 524 U.S. 775 (1998), Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)* and *Kolstad v. American Dental Association, 527 U.S. 526 (1999)* clarified that to avoid liability for workplace harassment, employers must conduct workforce training. Mandatory training has been a standard in EEOC settlement agreements, making training the rule for HR management.
>
> ***
>
> Training for managers and employees should include familiarity with anti-harassment law, the organization's policy, the consequences of violations and the procedures for complaints and investigations. Supervisors should receive extended training on investigation and reporting procedures.

42. Training thus plays a key role in an employer's ability to effectuate its policy, as the policy can only be effective if employees and managers understand what conduct is prohibited under the policy, the consequences of policy violations, and the procedures that must be followed to prevent, correct and eliminate harassment's recurrence.

43. In a Legal Report entitled "Male Sexual Harassment Claims: Training Is the Best Prevention" (January 2013), SHRM underscores the need for employers to focus on harassment prevention in the workplace for all employees, stating:

> A key first step is educating the workforce, and particularly supervisors, through an effective anti-harassment training program. The EEOC strongly encourages supervisor training as part of a harassment prevention program…..

44. SHRM's above-referenced article "Preventing Unlawful Workplace Harassment" highlights the front line role of an employer's Human Resources department in preventing workplace harassment, emphasizing:

> [Human Resource] professionals… must be on alert to stop harassment when they see it first hand or hear about it second hand.  They must promulgate anti harassment policies and communicate them to employees. They must educate supervisors to likewise spot and stop unlawful workplace harassment.

45. Here, no evidence exists to demonstrate that the Company engaged in any training efforts whatsoever.  That is, the Company failed to train supervisory personnel and non-supervisory employees about unlawful harassment, and any commitment it had to prevent harassment from occurring.

46. Training can be done by live, interactive sessions using an outside attorney or consultant.  Alternatively, it can be conducted by an experienced Human Resources professional or other top manager who is knowledgeable about the law and Company's policy on this topic.  Training is also available through videotapes, and web-based training is becoming increasingly popular.

47. The Company's policy entitled "Sexual and Other Unlawful Harassment" states that "[a]ll supervisors have been trained and are required to immediately report complaints of harassment to one of the above individuals."  (Exh. 5, pg 24.)  Thus, in addition to failing to adhere to best practices with regard to training supervisors on unlawful harassment, the Company also failed to adhere to its own policy provisions in this regard.

48. George confirms that he received no training whatsoever on harassment while he was employed as a supervisor by PCA.  Adam Clark states that he was never informed of PCA's anti-discrimination policy and that he "never knew such a policy existed."  (Aff. of Adam Clark, ¶3).

49. By failing to engage in reasonable measures to provide training on the policy to employees and managers, and in particular to those individuals who were purported to be the recipients of harassment complaints, the Company rendered its (flawed) policy wholly ineffective.

50. In essence, PCA failed at every turn to adhere to best practices in preventing harassment. The Company failed to promulgate its harassment policy and communicate it to employees and failed to educate its supervisors on how to spot possible harassment and how to respond where they believe it may have occurred.  Given these failures, it comes as no surprise that PCA failed to be on alert to stop harassment in the workplace, and to respond immediately when it first received constructive notice of the alleged noose incident through its supervisors.

> 3.  *The Policy is Deficient Because it Fails to Clearly Articulate a Complaint Procedure*

51. A review of the policy shows numerous glaring deficiencies in its complaint procedure. First, the policy contains a section entitled "PROMPT REPORTING IS REQUIRED."  This policy section informs employees that it "is your responsibility to bring your complaints and concerns to the companies [sic] attention."  (Exh. 5, pg 22). In so doing, employees are misled to believe that the responsibility to come forward with a complaint that they have been subjected to harassment lies solely with them.  Such a statement belies the concurrent responsibility that lies with supervisors to report alleged harassment of which they become aware, and contradicts the policy statement under the heading "COMPLAINT PROCESS" that "[a]ll supervisors… are required to immediately report complaints of harassment to one of the above individuals."  (Exh. 5, pg 24).

52. Such deficiencies are exacerbated by the policy's failure to identify the names of individuals within the Company who are designated to receive complaints of alleged harassment.  In the "Complaint Process" section of  the  harassment policy included in the Employee Handbook, individuals are told to report any potential harassment to the "President or General Manager." (Exh. 5, pg 24).

53. The PCA President was Bob Jesurum (Denney Dep. at 98:14), however, during the term of George Wilson's employment, PCA did not have an employee in the role of "General Manager." (Denney Dep. at 99:17).

54. To add even more confusion (and render the policy even more meaningless), a different complaint process appears in the version of the policy that was attached to the January 16th memo emailed to all employees.  That policy version directs employees to report to the President or the "Executive Committee," rather than the "General Manager."  (Exh. 6, pg 4). This revised policy version suffered from the same deficiencies as the one in the Employee Handbook in that it fails to identify the members of the Executive Committee as specified under that section.

55. Given the policy's failure to identify the General Manager or the members of the Executive Committee, the only individual who was clearly identified as the recipient of harassment complaints was the President of PCA.  The problematic nature of relying on a single individual as the recipient of such complaints is evidenced here, where PCA President, Robert Jesurum, was out of work quite often during some of the times relevant to this case as a result of his wife's illness and then death.  In addition, George worked the second shift, and his workday did not fully overlap with Robert's.  This deficiency in the harassment policy's complaint procedure further undermined the policy's effectiveness.

56. By failing to maintain a policy with an effective complaint procedure, the Company failed to take reasonable measures to effectuate its policy and prevent harassment or its recurrence.

      *4.     The Company Fostered or Tolerated a Culture Where Employees at All Levels Acted Inappropriately*

57. An employer must make a good-faith effort to prevent harassment from occurring, and it begins with having a comprehensive policy and communicating that throughout the workforce, as articulated above.  Equally critical is ensuring that the work environment is free from harassment.  Looking at what actually goes on in the workplace is important.  Thus, even if an employer has implemented an anti-harassment policy and complaint procedure and has communicated that policy effectively, the employer's obligation is not exhausted.

58. An employer, through its management, has a duty to ensure that the policy is followed.  Supervisors and all levels of management must act as role models of lawful and appropriate workplace behavior.  They must also be visible and accessible to employees so that they can effectively monitor the workplace and ensure that no harassment is ongoing.  They cannot engage in policy violations themselves.  Employers are strictly responsible for ensuring that managers adhere to the policy against harassment.  They also have a duty to exercise reasonable care in enforcing and policing workplace standards of conduct.  Having appropriate policies and doing training can be almost irrelevant if supervisors and managerial agents of the Company don't take seriously the mantra of a harassment-free work environment, as the policies and training teach.

59. By the Company's own admission in the January 16, 2012 "Harassment – Please post" memorandum, PCA acknowledges that "a 'culture' has arisen which allows the use of slurs,

sexual and otherwise, during the conduct of our jobs." (Exh. 6, pg 1).   The Company

referenced a single "racial harassment" incident, but stated that it was "by no means

isolated." *Id*.

60. The New Hampshire Supreme Court, in *Michelle Madeja v. MPB Corporation d/b/a Split

Ballbearing,* 149 N.H. 371 (2003), considered whether an employer proved that it engaged in

"good-faith efforts" to comply with Title VII.[5]  In that case, the evidence revealed that the

defendant employer maintained an anti-discrimination policy and periodically showed its

employees videos about sexual harassment.  The court ruled that the mere existence of an

anti-discrimination policy or presentation of seminars on anti-discrimination laws does not

automatically satisfy the good-faith requirement.  Rather, an employer must also show its

"sincere commitment to enforcing its policy." Below are numerous examples of conduct that

took place during George Wilson's tenure that should have prompted the Company to take

action in response to multiple violations of its harassment policy but to which the Company

turned a blind eye:

   a.  The Company was informed in 2008, through its manager, that a racially-

       derogatory photograph of Barack Obama was circulated in the workplace.

   b.  George Wilson recalled that the offensive picture was present in approximately

       2008 when Barack Obama was running for President for the first time.  He said

       that no one in the Maintenance Department liked Obama, and George recalled the

---

[5] The United States Supreme Court, in *Kolstad v. American Dental Assn.*, 527 U.S. 526, 545 (1999), held
that an employer will be absolved from liability for punitive damages in certain circumstances when it has
made good-faith efforts to comply with Title VII.

picture being in a pamphlet that contained black drawing around the eyes and black writing to thicken President Obama's lips.

c.  After seeing this offensive picture, George said that he informed Scott (last name unknown), the Fuel Farm Manager, and he showed him the picture.  Scott was appalled, according to George, and suggested that George take home the picture and save it.  According to George, Scott said to him, "If you have more problems, you have this as evidence."

d.  Another employee, Roger Brooks, also acted inappropriately, according to George, when he used the N word to him sometime in 2008 or 2009.  George advised me that, at approximately 5:00 a.m. one day, he and Roger got into an argument.  Roger said, "What the fuck you gonna do, nigger?"  Tim David was present. Following this incident, George again reported it to Scott.  It does not appear that Scott took any action.

e.  Adam Clark, by his own admission, engaged in racial slurs and jokes throughout the entire time he worked at the Company.

f.  In addition to employees engaging in inappropriate behavior, managers have crossed the line as well.  Conduct of this nature by managers is particularly egregious, given that they are charged with being the appropriate role models and enforcing the Company's policy.  A company only acts through its managers and supervisors, and so their conduct is imputed to the company.

g.  A number of managers have engaged in inappropriate conduct, according to George.  Dick (last name unknown), the Head of Maintenance, and Rich Rule, Maintenance Manager, participated in racial jokes toward a male Maintenance

employee who worked for PCA in approximately 2011.  This employee only

worked at the Company for several months.  Eric Logan is one of the employees

who told George about the barrage of jokes that were said about this black

employee.

h.  Also, sometime between 2009 and 2011, Roger Brooks, in his capacity as Fuel

Farm Manager, was also known to use the term "sand nigger" in regard to Amad

Jujabie ("AJ").  AJ, who is from Dubai, worked for a company called Alpha

Flying which is located near PCA.  He came to PCA frequently to purchase fuel

from PCA, and he would often visit George when he was there.  According to

George, Roger used this racially-charged expression to AJ directly and also in

George's presence on numerous occasions.  In response, AJ would tell Roger to

watch his mouth.

i.  According to Adam Clark, in his March 3, 2014 Affidavit, he "observed Rob

Dunnell, a Line Service Shift Supervisor, referring to George in a racially charged

manner using terms such as 'boy,' 'nigger,' 'son,' and 'cotton picker.'" Aff. of

Adam Clark, ¶4.

j.  According to Adam Clark's own admission, "[o]n a near daily basis from

September 2010 to January 2012 while working at Port City Air, I would often

use racially charged terms including "boy," "nigger," and "son" in reference to

George."  Aff. of Adam Clark, ¶7.

k.  As a final example, George reported that John Andrews, his direct supervisor and

Line Service Manager for a few months in late 2011 and early 2012, violated the

racial harassment policy in several respects.  First, on John's second day of work,

November 29, 2011, he approached George and said, "What's up, brother?"
These were the first words that he said to George, and George was offended by
them.   George told me that he responded, "I'm not your brother.  Who are you?"
George heard from others, including Andy Catino, that John Andrews made racist
jokes and remarks, particularly on Sundays.  For example, George was told that
John said, "We're gonna get this nigger out of here.  He's a lazy shit," and
referred to George as a "black bastard."  George never heard these comments
directly, but was aware that John made them.

B.   *The Employer Failed to Implement Appropriate Corrective Measures Contrary to Sound Employment Practices and Its Own Policy*

61. Once an organization is on notice of a potential violation of its harassment policy, it must act
reasonably, promptly and thoroughly in response.  The Company policy says as such. (Exh.
5, pg 24).  The action to take includes investigating properly the complained-of or otherwise
known conduct, responding to it, and putting measures in place going forward to ensure that
it does not recur.   In this case, the Company failed repeatedly to take appropriate corrective
measures.

62. In its guide entitled "Investigations: How to Conduct an Investigation" (April 2013), SHRM
makes clear that:

> "When an employee makes an informal or formal complaint, the employer should take
> immediate steps to stop the alleged conflict, protect those involved and begin
> investigations.  Under many laws (e.g., Title VII, Americans with Disabilities Act
> (ADA), Age Discrimination in Employment Act (ADEA), Occupational Safety and
> Health Act (OSHA), Sarbanes-Oxley, state and local nondiscrimination laws),
> employers are legally obligated to investigate complaints (harassment, discrimination,
> retaliation, safety and ethical) in a timely manner.  In addition, any appropriate
> corrective action is required to be taken by the employer to ensure illegal actions and
> behaviors cease immediately.

21

> Responsiveness to a complaint and an investigation will not only yield the best information and evidence, but it will also enhance both the investigator's and the employer's credibility. Investigations can help the organization identify and resolve internal problems before they become widespread."

63. The EEOC has made clear that employers have an obligation to investigate claims of sexual harassment, and its principles are equally relevant with regard to claims of harassment on the basis of other legally protected categories such as race.  In its "Policy Guidance on Current Issues of Sexual Harassment," the EEOC instructs that, "in investigating sexual harassment charges, it is important to develop detailed evidence of the circumstances and nature of any such complaints or protests, whether to the alleged harasser, higher management, co-workers or others."  It is obviously impossible to do this without the investigation that is undertaken being meaningful and thorough in nature.

64. Further elaborating on the duty to investigate in the context of remedial action, the EEOC Policy Guidance prescribes:

> Since Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult (*Vinson*, 106 S. Ct. at 2405), an employer is liable for failing to remedy known hostile or offensive work environments.  *See, e.g., Garziano v. E.I. Dupont de Nemours & Co.,* 818 F.2d 380, 388, 43 EPD ¶ 37,171 (5th Cir. 1987) (*Vinson* holds employers have an "affirmative duty to eradicate 'hostile or offensive' work environments"); *Bundy v. Jackson*, 641 F.2d 934, 947, 24 EPD ¶ 31,439 (D.C. Cir. 1981) (employer violated Title VII by failing to investigate and correct sexual harassment despite notice); *Tompkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044, 1049, 15 EPD 7954 (3d Cir. 1977) (same); *Henson v. City of Dundee*, 682 F.2d 897, 905, 15 EPD ¶ 32,993 (11th Cir. 1982) (same); *Munford v. James T. Barnes & Co.*, 441 F. Supp. 459, 466 16 EPD ¶ 8233 (E.D. Mich. 1977) (employer has an affirmative duty to investigate complaints of sexual harassment and to deal appropriately with the offending personnel; "failure to investigate gives tactic support to the discrimination because the absence of sanctions encourages abusive behavior").

> When an employer receives a complaint or otherwise learns of alleged sexual harassment in the workplace, the employer should investigate promptly and thoroughly....

*See also Watson v. Blue Circle, Inc.,* 324 F.3d 1252 (11th Cir. 2003) (in which issues of adequacy of investigation of harassment complaints by female cement truck driver resulting in reversal of district court's summary judgment in favor of defendant employer); *Hatley v. Hilton Hotels Corp.,* 308 F.3d 473 (5th Cir. 2002) (employer's investigation of plaintiff's complaints of harassment deemed insufficient to overcome having ignored similar, past complaints, resulting in appellate court's refusal to overturn jury award for plaintiff); *Malik v. Carrier Corp.,* 202 F.3d 97 (2d Cir. 2000) (holding that employer's investigation of sexual harassment complaint is required by law).

### 1. *The Company Should Have Acted Once It Was on Notice of Racial Remarks and the Noose Incident*

65. Employers act through their people, and an employer has a duty to respond to possible harassment once it has actual knowledge or constructive knowledge of conduct that runs afoul of its harassment policy.  Constructive knowledge exists where supervisory personnel are aware of the situation.  It also includes when an employee confides in a managerial-level employee and reports incidents that may constitute harassment.  The Company had plenty of notice prior to January 12, 2012, which is when it states that it first became aware of the noose incident that had occurred two (2) months earlier.

66. In "Anti-Harassment Training Following the Supreme Court's Vance Ruling"  (July 2013), SHRM analyzes the United States Supreme Court's June 2013 decision in *Vance v. Ball State University*[6] relating to vicarious employer liability for supervisors under the Title VII.  In that analysis, SHRM underscores that "[a]s soon as a manager learns of a potential situation, the manager needs to understand that he or she needs to act promptly."

_____

[6] 133 S.Ct. 2434 (2013).

67. In this case, George Wilson states that he was subjected to a barrage of racial comments from Adam Clark and other workers.  Adam Clark confirmed that he has regularly engaged in racial remarks since the inception of his employment. Adam further stated that Robert Dunnell, a Line Supervisor, also made derogatory and racial remarks. The Company knew or should have known about these racial comments.

68. The noose incident, which occurred on November 8, 2011, was a significant event.  On that day, George discovered two (2) thick ropes that were made into noose slipknots, which were hanging in his office.  One was hanging from the ceiling while the other one was by his work mailbox.  Adam Clark and Josh Blaisdell were responsible for this hideous joke.

69. George advised that, in early December 2011, Maren Gallo, who worked as a Concierge, overheard Adam Clark, Tim David, and either Josh Blaisdell or Adam Bussey talking about the noose incident.  They were laughing about it, and said, "We put the noose in the black bastard's office.  We wish we could kill him."  She was offended, and directed the employees to stop talking and leave the front lobby.  If employees like Maren heard this talk, which seemed to be out in the open, and may well have involved a manager such as Adam Bussey, this likely is sufficient to put the Company on notice that such offensive behavior took place and needed to be stopped.

70. The Company has demonstrated that it fails to know what a complaint is under the law and under its policy and, therefore, it has failed to act properly.  PCA takes the position that it received knowledge of workplace harassment only on January 12, 2012 when George had a meeting with PCA executives and discussed the noose incident.  In its submissions to the Commission for Human Rights, the Company states, "Wilson never reported any harassment before January 12, 2012."  It failed to recognize, however, that George explicitly reported to

Purchasing Manager Wendy Raboteur at least a week earlier, and she, in turn, informed President Robert Jesurum about it.  George's report to Wendy, a manager, is a report to the Company.  George's report to Director of Sales and Marketing Lisa Campbell, prior to the meeting with Bob Jesurum and Ned Denney, similarly is a complaint that put the Company on notice.  Nevertheless, the Company wrongly insists that George first reported the incident to Bob Jesurum and Ned Denney on January 12, ignoring the two (2) reports to two managers beforehand.

71. According to George, prior to the recent problems he experienced, he reported at least two (2) incidents of racially-inappropriate conduct to his former manager, Scott (last name unknown).  The first was the Obama caricature, which the Company admitted had occurred, and the second were the nigger comments made by Roger Brooks.  While Scott appeared to be sympathetic, according to George, he did not report the matter to any Company executive nor does it appear he spoke to the persons who may have been involved.  This inaction further contributed to the culture that allowed such inappropriate talk to continue to recur time after time.  Moreover, it violated the Company policy that required managers to report harassing conduct pursuant to the Complaint Procedure.

### 2.  The "Investigation" Lacked Thoroughness

72. Investigations must be thorough.  That means that an employer must take reasonable steps, from start to finish, to find the facts and reach conclusions.  That includes planning and strategizing about the investigation; interviewing the complaining party, the person(s) accused, and other witnesses as needed; taking contemporaneous notes; reviewing relevant documents; making credibility determinations if necessary; reaching conclusions; and

properly documenting.  In this case, the Company failed in numerous respects to comply with industry standards on conducting a proper investigation

73. The SHRM treatise, "The Essential Guide to Workplace Investigations" (2nd ed. 2010), makes clear that effective workplace investigations are those designed to "figure out what happened":

> The immediate aim of any investigation is to get to the bottom of a problem.  You won't know how to handle a situation until you know what really happened.  And acting before you have all the facts could lead you to discipline the wrong employee or allow a workplace problem to continue.

74. This treatise underscores that an incomplete investigation may operate as the functional equivalent of no investigation:

> Performing an incomplete or sloppy investigation-- by failing to interview key witnesses, neglecting to review important documents or ignoring issues that come up during the investigation, for example-- can have many of the same consequences as failing to investigate at all.

 (Id. at pp. 5, 19-20).

75. Although PCA conducted an investigation into the noose incident, the investigation was woefully inadequate.  In drawing this conclusion, one of the resources to which I referred was the Association of Workplace Investigators, Inc. (AWI)'s "Guiding Principles for Investigators Conducting Impartial Workplace Investigations" (revised July 2013), with regard to evidence gathering and retention.  As AWI states, the guiding principle here is that the "[i]nvestigator should gather relevant evidence."  Among the key factors that should be considered in carrying out that obligation are:

- The nature of the allegations
- The probative value of the evidence, weighed against the costs of gathering the evidence, in terms of available financial resources, time and potential disruption to the workplace

76. In light of the severity of George's allegations[7] and the fact that the Company's preliminary investigation revealed other alleged incidences of inappropriate harassment (as evidenced by its January 16th memo to employees stating "our investigation into this matter has revealed that while this incident crossed over the top, it was by no means isolated"), the Company should have engaged in reasonable efforts to uncover *all* evidence relevant to this issue.  My review of the facts shows that little, if any, effort was made.

77. The Company considers its investigation to have begun on January 12, 2012, when George met with Robert Jesurum, Ned Denney, and Lisa Campbell in Robert's office.  George asserts that he reported the noose incident as well as other racial remarks and jokes that had been ongoing during that meeting.  He shared the photograph of the noose that he took as soon as he discovered it.  He advised Robert, Ned, and Lisa that male employees would use words such as "boy," "black bastard," and "nigger."  He said they made numerous comments

---

[7] To recognize the severity of the race-based harassment to which George Wilson was subjected, one need look no further than the EEOC Compliance Manual Section 15: Race and Color Discrimination (April 2006).  In this document, the EEOC states:

> Examples of the types of single incidents that can create a hostile environment based on race include: an actual or depicted noose or burning cross (or any other manifestation of an actual or threatened racially motivated physical assault)… [and] an unambiguous racial epithet such as the 'N-word'….

This EEOC document goes on to provide "examples designed to explain the concept of sufficiently 'severe or pervasive' to alter someone's working conditions" so as to create a hostile work environment.  The first cited example (Example 15) articulates a fact pattern that is eerily reminiscent of the conduct to which George was subjected.  Example 15 describes Tim, an African American employee who, after a racially charged dispute with a white co-worker, is subjected to the following:

> The co-worker told Tim "Watch your back, boy!  The next day, a hangman's noose, reminiscent of those historically used for racially motivated lynchings, appeared above Tim's locker.  Given the violently threatening racial nature of this symbol and the context, this incident would be enough to alter Tim's working conditions."

and jokes.  For example, he told them how Maren Gallo reported that she overheard several male employees talking about how they wanted to "kill the black bastard" and joked about the noose incident.  George said that all of the guys participated, and he specifically named Adam Clark, Tim David, Adam Bussey, John Andrews, and Josh Blaisdell.

78. Robert Jesurum assured George that the Company would investigate.

79. That did not happen, exactly.  While the Company did approach Adam Clark and Josh Blaisdell, the two (2) people involved in the noose incident, and suspended them, it did not address the other employees whom George named as being involved in inappropriate racial conduct.  That is, I see no evidence that the Company met with Tim David, Adam Bussey, or John Andrews.  It is unknown how much George was questioned about incidents that took place prior to and subsequent to the noose incident, which had occurred two (2) months earlier.  George should have been questioned extensively about any and all incidents that could have violated the Company's harassment policy so that the Company could respond properly.  The Company should have met with all known potential harassers as well as witnesses.

80. The memorandum dated January 16, 2012 certainly is recognition on the Company's part that "tasteless banter," a "sick joke," and a "culture" that includes the use of slurs constitutes "racial harassment" which prompts the "urgent memorandum" and the "greatest concern." While the Company did take some action to investigate, it was not enough.  It lacked thoroughness, and it lacked a commitment to truly eradicating racial harassment in the workplace and ensuring that it does not take place again.

### 3.   The Disciplinary Action Taken Against Two Individuals Was Insufficient

81. PCA did take action against the two individuals involved in the noose incident.  It suspended both employees, and then it terminated the main culprit.  It should have done more, however.

82. George was advised on January 19, 2012 that the Company suspended the two (2) employees involved in the noose incident.  More particularly, Robert Jesurum and John Andrews met with George and told him that Josh Blaisdell was suspended without pay for one week, effective January 13, pending the investigation.  Further, they advised him that Adam Clark was suspended on January 16, and this was for a 2-week period.  He eventually was discharged.

83. While an employer has reasonable discretion in deciding what corrective action is appropriate, what was inappropriate in this case was the communications it had with George about what corrective action to take.  The Company advised George that it had not made a decision about Adam Clark's status, and it conferred with George about it.  No victim of harassment should be put in the position of deciding the fate of a co-worker in these circumstances.  Someone like George has already been victimized, and the Company's action placed him in an untenable position to have to be the one to make the choice to terminate someone else's employment and have that person lose his or her job.  This is not the role of the victimized employee; rather, it is a non-delegable responsibility of the employer.  The Company notes in its papers submitted to the Commission that Josh Blaisdell was not further disciplined "at the specific request of [George] Wilson."  Again, the Company should not have placed the victimized employee in the position to mete out corrective measures.

84. Also, because George informed Company managers that others (including Tim David, Adam Bussey, or John Andrews) were involved in racially-offensive conduct, other PCA personnel

should have been subjected to corrective action as well.  They were not.  Accordingly, the
Company failed to take appropriate measures here, and this is a direct result of the inadequate
investigation that was conducted.

### 4.  The Remedial Action Taken Was Insufficient

85. An employer is obligated to take remedial action following an investigation when it was
revealed that misconduct occurred.  Here, the Company distributed by email a memorandum
and attached the Company's harassment policy to it.  Further, it posted the memorandum in a
conspicuous place.  Sometime thereafter, it conducted some type of sensitivity training for
the workforce.  As explained below, those steps were insufficient and, indeed, did more harm
than the intended good.

86. The memorandum that was circulated to employees on January 16, 2012, as well as posted, is
actually a perfect example of what an employer should **not** do.  While I have often crafted
memos for company officials to circulate in the wake of offensive behavior, as a reminder of
a company's anti-harassment policy, the memo that was drafted in this instance was
deplorable.  In fact, it exacerbated an already sensitive and volatile situation.

87. The memo called attention to a "recent event of racial harassment." (Exh. 6, pg 1).

88. One significant point is that George tells me that he was the only black employee at the time
this memorandum was posted.  Indeed, he named only a small handful of other black
employees that he could recall ever hired by PCA.

89. The fact that the Company stated that "racial harassment" had occurred certainly would lead
all reasonable employees to conclude that George Wilson was the victim of it.  The Company
characterized the misconduct that George was subjected to as "tasteless banter" and "a sick

joke which crossed any line" that could be acceptable.  (Exh. 6, pg 1). The Company further
acknowledged that inappropriate slurs had been used as well.

90. Next, Robert Jesurum, in the January 16 memo, instructed all managers to discuss with their
employees the importance of maintaining professionalism at all times. (Exh. 6, pg 2). I have
seen no documentation to evidence that this directive was, indeed, carried out.

91. Further, in the memorandum, Robert Jesurum stated that every employee is "required" to be
familiar with its anti-harassment policy, which was included in the email distribution. (Exh.
6, pg 2).   However, the Company appeared to have taken no steps to ensure that employees
were, in fact, familiar with the policy.  That is, the Company did not require employees to
sign an acknowledgement form indicating that they had read, understood, and agreed to
comply with the terms.  It never asked for confirmation that employees received the email
and agreed to take the action required in the email.

92. George advised me that several employees and other persons approached him after this
memorandum was circulated both electronically and posted on the door as one would exit the
hangar.  Several customers approached George about it, including but not limited to Janet
(last name unknown), and Mark (last name unknown) from a company in Boston called
Tisma. (Wilson Dep. at 104:18 – 106:5). This made him feel very uncomfortable.

93. Shortly after the "investigation" concluded, Company President Robert Jesurum gave George
a book entitled "The Warmth of Other Suns" by Isabel Wilkerson.  It was about African-
Americans who made the so-called Great Migration north.  An employer is required to take
appropriate remedial action, but a book of this nature could not reasonably be considered to
be an appropriate act. This act was insensitive and inappropriate.

94. While it does not appear that Robert Jesurum intended to offend George by this act, George was perplexed, found it odd, and felt uncomfortable by it.

### 5.  PCA Failed to Warn Employees About Retaliation

95. It is axiomatic that an employer must be vigilant about retaliatory activity by managers and co-workers alike after a well-publicized incident of harassment.  The employer should be sensitive to the victim of the harassment and check in periodically to ensure that the victim's work environment has not become more difficult.  Additionally, the employer should be reminding those involved not to retaliate or harm the victim in any way in the days, weeks and months after the conclusion of any investigation.  PCA failed to address retaliation in any way and, indeed, George felt further victimized by what he saw as retaliation.

96. In its presentation entitled "Retaliation Avoidance and Complaint Prevention Training for Supervisors" (2008), SHRM emphasizes four (4) key actions employers should take in order to avoid retaliation and prevent complaints:

1. Adopt and distribute an anti-retaliation policy that includes:
    ➢ A clear statement that, like discrimination and harassment, retaliation is prohibited by both law and company policy and retaliatory acts will lead to disciplinary action and or termination of employment;
    ➢ An example of types of retaliatory conduct
    ➢ A system for reporting retaliation;
    ➢ A statement that complaints will be promptly investigated and resolved;
    ➢  A statement that complaints will be maintained as confidential as possible.
2. Train managers on how to prevent retaliation complaints.  The training program should include:
    ➢ A description of the company's anti-retaliation policy
    ➢ Examples of retaliatory acts and or role playing scenarios
    ➢ Information on the consequences of illegally retaliating against employees
3. Monitor the treatment of employees who have complained or discrimination or provided information related to a discrimination complaint to ensure that they are not subjected to retaliation.
4. Investigate allegations of retaliation and take prompt corrective action with retaliation occurs.

97.  Retaliation does not appear to be an important concern to PCA.  It is not mentioned at all in the Company's anti-harassment policy.  It is not a topic that the Company has trained or educated its employees about at any time.  Further, the Company failed to take advantage of the opportunity in the January 16 memo that it circulated to all employees to mention that retaliation is forbidden under its policies as well as under the law.

98. After the memo was distributed, George was scared to go to work.

99. George certainly felt that he was subjected to increased scrutiny and disciplinary action for minor mistakes following the January 12, 2012 meeting with Robert Jesurum, Ned Denney, and Lisa Campbell about the harassment that he had been subjected to for quite some time. A look at the sequence of events after that reveals that the Company may not have been vigilant about possible retaliation.  George was demoted to Line Service Technician on March 16, 2012, purportedly because of a time-clock violation.  On March 28, 2012, George heard that Adam Bussey was prepared to implement a schedule change where George would have to work one weekend day, whereas he previously had worked Monday through Friday. George expressed to Adam that he felt discriminated against, that his seniority should protect him from working a weekend schedule, and that the more junior people, if needed, should work on the weekends.

100.    I note that George was suspended from work on April 6, 2012 for alleged threatening behavior toward Adam Bussey after an incident between them occurred.  Preceding this incident, however, George said there was a lot of talk about Adam Bussey wanting Adam Clark to return to PCA.  George overheard workplace talk in which Adam Bussey said that he wanted Adam Clark to be reinstated and, indeed, on March 30, 2012, Adam Clark came to PCA and told George that he was there at the invitation of Adam Bussey.  Understandably,

George was upset and angry with Adam Bussey for this, which could have led to increased emotions.

101.    In connection with this suspension, George was told to receive "anger management therapy" as a condition for returning.  I understand that while George did fulfill the requirements, he was terminated two (2) months later for an unrelated reason.  The proffered reason was that George failed to obtain security clearance for handling international flights, but George had lacked this clearance for quite some time and the Company knew about it.


Further affiant sayeth not.

I, Julie A. Moore, being under oath, swear the above facts are true to the best of my knowledge and belief.


Dated:  March 11, 2014                                   ____/s/Julie A. Moore_____
                                                        Julie A. Moore


Commonwealth of Massachusetts
County of Norfolk


Personally appeared Julie A. Moore, under oath, who swore that the information contained herein is accurate to the best of her knowledge and belief.


                                                        _____/s/Bradford W. Kron_____

                                                        Notary Public/~~Justice of the Peace~~

                                                        My commission expires: 9/2/16