## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

George Wilson

    v.                                    Civil No. 13-cv-129-LM
                                              Opinion No. 2014 DNH 262
Port City Air, Inc.


### O R D E R

George Wilson won a jury verdict against Port City Air,
Inc. ("Port City") on claims for retaliation under Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and New
Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann.
("RSA") § 354-A.  Before the court are Wilson's motions for: (1)
either additur or a new trial on damages; and (2) attorneys'
fees and costs.  Port City objects to Wilson's first motion in
its entirety and also objects to the amount of fees and costs
Wilson seeks.  The court heard oral argument on Wilson's motions
on December 1, 2014.  For the reasons that follow, Wilson's
motion for additur or a new trial is denied, and his motion for
attorneys' fees is granted in part.


### I. Background

Wilson initially sued four defendants in 20 counts.
Against Port City, he asserted: (1) three claims for racial

discrimination and two claims for retaliation under RSA 354-A;[1]
(2) three claims for racial discrimination and two claims for
retaliation under Title VII;[2] and (3) a state common-law claim
for wrongful discharge.  He also asserted nine claims against
Port City employees Robert Jesurum, Ned Denney, and Adam Clark,
but those claims were all dismissed before trial.  At trial,
Wilson prevailed on identical state and federal retaliation
claims that "Port City suspended and/or discharged [him] in
retaliation for filing a complaint with the New Hampshire
Commission for Human Rights [HRC]," Verdict Form (doc. no. 99)
1, but Port City prevailed on all of Wilson's other claims,
including his claim for wrongful discharge, see id. at 2.  The
jury awarded Wilson $15,000 in compensatory damages for pain,
suffering, and mental anguish resulting from his retaliatory
suspension.

---

[1] Two of the discrimination claims were based upon a
hostile-work-environment theory, and the third was based upon a
disparate-treatment theory.  One retaliation claim arose from a
demotion resulting from Wilson's having made an internal
complaint about the work environment at Port City, and the other
arose from Wilson's suspension with pay and his ultimate
discharge, resulting from his having filed a charge with the New
Hampshire Commission for Human Rights.

[2] Wilson's Title VII claims were virtually identical to his
claims under RSA 354-A.

## II. Additur

Wilson argues that the court committed legal error by: (1) excluding evidence of lost wages; (2) barring him from arguing lost wages to the jury; and (3) failing to instruct the jury on lost wages.  For that reason, he asks the court to award him $21,956 in lost wages, under the theory of additur, or to schedule a new trial on damages.

The problem with Wilson's request is that he did not prevail on any claim for which he could have recovered lost wages.  He prevailed on a claim that he was suspended in retaliation for filing a charge with the HRC, and it was undisputed that he was suspended, with pay, until he was discharged.  Because Wilson's suspension resulted in no loss of pay, he could not recover lost wages as a remedy for a retaliation claim based upon his suspension.  Such a remedy might be appropriate for a retaliation claim based upon termination.  But, because Port City prevailed on Wilson's wrongful-termination claim, it is clear that the jury did not find that his discharge was retaliatory.  See Porter v. City of Manchester, 151 N.H. 30, 38 (2004) (explaining that to prove wrongful termination, "the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment") (quoting Cloutier v.

Great Atl. & Pac. Tea Co., 121 N.H. 915, 921 (1981)) (emphasis added).  Thus, regardless of whether the court was correct in determining that Wilson failed to produce sufficient evidence to permit a reasonable jury to make a non-speculative award of lost wages, his motion for additur or a new trial on damages, document no. 102, must be denied.

### III. Attorneys' Fees

The parties agree that Wilson is entitled to some amount of attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k).[3]  They further agree that the court should use the "lodestar" approach to calculate the amount of the award.

> In fashioning the lodestar, the first step is to calculate the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are "excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).  The second step entails a determination of a reasonable hourly rate or rates — a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence.  See [Gay Officers Action League v. Puerto Rico], 247 F.3d [288,] 295 [(1st Cir. 2001)].  The product of the hours reasonably worked times the reasonable hourly rate(s) comprises the lodestar.

---

[3] In Central Pension Fund of the International Union of Operating Engineers & Participating Employers v. Ray Haluch Gravel Co., 745 F.3d 1 (1st Cir. 2014), where "[n]either party . . . argued that the [plaintiffs'] right to attorneys' fees under [state law] differ[ed] in any material respect from [their] corresponding right under [federal law]," id. at 4, the court of appeals applied the federal law applicable to attorneys' fees, see id. at 5.  So too here.

Cent. Pension Fund of the Int'l Union of Operating Eng'rs &
Participating Emp'rs v. Ray Haluch Gravel Co., 745 F.3d 1, 5
(1st Cir. 2014) (parallel citations omitted).  Port City does
not contest the hourly rates Wilson's attorneys have used to
calculate the lodestar.  Rather, the parties' disagreement
concerns Port City's arguments that the court should: (1)
exclude from the lodestar all of the fees and costs generated by
two categories of legal work and a portion of the fees generated
by a third category of work; (2) deduct fees associated with
Wilson's claims against Robert Jesurum, Edward Denney, and Adam
Clark; and (3) adjust the lodestar downward.

    In his motion, Wilson asks the court to award him
$201,884.70 in attorney's fees and $4,339.89 in costs.[4]  If the
court were to apply all of the exclusions, deductions, and
adjustments that Port City proposes, Wilson would receive an
award for fees and costs in the neighborhood of just over
$20,000.  The amount to which Wilson is entitled lies between
the amount he seeks and the amount to which Port City says he is
entitled.  The court begins its analysis by sketching the

_____

        [4] The figures in Wilson's motion are different from these.
These figures reflect a shifting of one item from the category
of costs to the category of fees, for reasons described in
Section III.B.1.

relevant law and then turns to Port City's proposed lodestar
exclusions, deductions, and adjustments.

    A. The Relevant Law

The court begins with general principles.  Congress has
enacted fee-shifting statutes in a number of areas "in order to
ensure that federal rights are adequately enforced." Perdue v.
Kenny A. ex rel. Winn, 559 U.S. 542, 550 (2010).  More
specifically, federal fee-shifting statutes encourage plaintiffs
of limited means to bring claims that, if successful, would
vindicate rights of importance to the public at large but would
not necessarily result in an award of damages that is adequate
to attract counsel in the private market for legal services.
See City of Riverside v. Rivera, 477 U.S. 561, 576-81 (1986);
c.f. Diaz v. Jiten Hotel Mgmt., Inc., 741 F.3d 170, 178 (1st
Cir. 2013) (discussing purpose of Massachusetts fee-shifting
statute, which is largely similar to Title VII fee-shifting
provision).  To the end of ensuring that such claims are
litigated, the "reasonable fee" referred to in most federal fee-
shifting statutes "is a fee that is sufficient to induce a
capable attorney to undertake the representation of a
meritorious . . . case," Perdue, 559 U.S. at 552 (citations
omitted) but not so large that it produces a windfall for the
attorney, see id.

Turning to the mechanics of requesting an award of fees, "[t]he prevailing party has the burden of proving the reasonableness of the hours claimed," Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008) (citation omitted). Consequently, "the failure of a fee-seeker to submit reasonably explicit time records may have deleterious consequences on the amount of fees awarded," Burke v. McDonald, 572 F.3d 51, 63 (1st Cir. 2009) (citation and internal quotations marks omitted). When determining the number of hours reasonably expended, "[t]he district court . . . should exclude from this initial fee calculation hours that were not reasonably expended." Hensley, 461 U.S. at 434 (citation and internal quotation marks omitted). Thus, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Id.

After the lodestar has been calculated, by multiplying a "reasonable [number of] hours [by] a reasonable rate[,] . . . [t]here remain other considerations that may lead the district court to adjust the fee upward or downward." Hensley, 461 U.S. at 434 (internal quotation marks and footnote omitted). Those factors include:

(1) the time and labor required; (2) the novelty and
difficulty of the questions; (3) the skill requisite
to perform the legal service properly; (4) the
preclusion of employment by the attorney due to
acceptance of the case; (5) the customary fee; (6)
whether the fee is fixed or contingent; (7) time
limitations imposed by the client or the
circumstances; (8) the amount involved and the results
obtained; (9) the experience, reputation, and ability
of the attorneys; (10) the "undesirability" of the
case; (11) the nature and length of the professional
relationship with the client; and (12) awards in
similar cases. [Johnson v. Ga. Highway Express,
Inc.,] 488 F.2d [714,] 717–719 [(5th Cir. 1974)].

Hensley, 461 U.S. at 430 n.3. However, "many of [the so-called

Hensley] factors usually are subsumed within the initial

calculation of hours reasonably expended at a reasonable hourly

rate." Id. at 434 n.9 (citing Copeland v. Marshall, 641 F.2d

880, 890 (D.C. Cir. 1980)).

"[T]he 'results obtained' in litigation are a 'preeminent

consideration in the fee-adjustment process.'" Diaz, 741 F.3d

at 178 (quoting Joyce v. Town of Dennis, 720 F.3d 12, 27 (1st

Cir. 2013)); see also Hensley, 461 U.S. at 434 (explaining that

the "results obtained" factor "is particularly crucial where a

plaintiff is deemed 'prevailing' even though he succeeded on

only some of his claims for relief"). The term "results

obtained" covers a good bit of ground:

It can refer to a plaintiff's success claim by claim,
or to the relief actually achieved, or to the societal
importance of the right which has been vindicated, or
to all of these measures in combination. We think
that the last meaning is the best choice, and that, as

> a consequence, all three types of "results"
> potentially bear upon the amount of an ensuing fee
> award.

Joyce, 720 F.3d at 27 (quoting Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 338 (1st Cir. 1997)); see also Burke, 572 F.3d at 65 n.11 ("After computing the lodestar, the district court would have been within its discretion to consider an adjustment — upward or downward — based on the results obtained by taking into account Burke's claim-by-claim success, the relief obtained, and the societal importance of the right vindicated.").

With regard to the first aspect of results obtained, claim-by-claim success, there are cases in which "a plaintiff . . . present[s] in one lawsuit distinctly different claims for relief that are based on different facts and legal theories." Hensley, 461 U.S. at 434. In such a situation, "even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim, [and] work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" Id. at 434-35 (quoting Davis v. County of L.A., No. 73-63-WPG, 1974 WL 180, at *3 (C.D. Cal. June 5, 1974)). When that happens, "no fee may be awarded for services on the unsuccessful claim." Hensley, 461 U.S. at 435; see also Diaz, 741 F.3d at 173

(affirming district court's decision to reduce lodestar "by refusing to make [defendant] pay for attorney's fees incurred by [plaintiff] in the pursuit of unsuccessful and largely independent claims"); Burke, 572 F.3d at 63 ("It is well-established that fees are appropriately excluded from the lodestar when different claims for relief are not interconnected, that is, when the claims rest on different facts and legal theories") (quoting Bogan v. City of Bos., 489 F.3d 417, 428-29 (1st Cir. 2007)) (additional citation, punctuation, and internal quotation marks omitted).

But in cases where "the plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories," Hensley, 461 U.S. at 435, such that "it [is] difficult to divide the hours expended on a claim-by-claim basis," id., fees may be awarded for work devoted to issues on which the plaintiff did not prevail, see id.  Procedurally, "[i]f the fee-seeker properly documents her claim and plausibly asserts that the time cannot be allocated between successful and unsuccessful claims, it becomes the fee-target's burden to show a basis for segregability."  Burke, 572 F.3d at 63 (quoting Lipsett [v. Blanco], 975 F.2d [934,] 941, [(1st Cir. 1992)]) (emphasis omitted).

With regard to the second aspect of results obtained, often referred to as "proportionality," it is well established that a court must "consider the relationship between the extent of success and the amount of the fee award," Hensley, 461 U.S. at 438, and may adjust a lodestar downward if the two are disproportionate, see Central Pension, 745 F.3d at 6.  Such an adjustment may be warranted under several circumstances, including a request for fees that dwarfs a plaintiff's recovery, see id. at 7, or an award of damages that is dwarfed by the amount of damages the plaintiff sought to recover, see id.  At the same time, however, "the rigid use of proportionality as the sole determinant of as lodestar-based fee award" is strongly disfavored, id. at 6-7 n.3.

With regard to the third aspect of results obtained, the societal importance of the right vindicated, the court of appeals has pointed out that statutory

> [f]ee-shifting provisions in general reflect a legislative judgment that "'the public as a whole has an interest in the vindication of the rights conferred by the statutes . . . over and above the value of a . . . remedy to a particular plaintiff.'" City of Riverside v. Rivera, 477 U.S. 561, 574 (1986) (quoting Hensley, 461 U.S. at 444 n.4 (Brennan, J., concurring in part and dissenting in part)).

Joyce, 720 F.3d at 31 (parallel citations omitted).

B. Exclusions from the Lodestar

Port City argues that the court should exclude from the lodestar: (1) all the fees and costs that resulted from retaining and working with expert witness Julie Moore; (2) all the fees that resulted from Wilson's attorneys' efforts to reschedule court events to accommodate the personal schedule of Attorney Matthew Broadhead; and (3) some of the fees associated with preparing for oral argument on Port City's motion for summary judgment.  The court agrees.

1. Julie Moore

In his motion for attorney's fees, Wilson seeks to recover: (1) the $8,693.50 Attorney Broadhead billed for the time he spent working with Julie Moore, Esq., whom he intended to call as an expert witness; and (2) the amount Moore billed for her work on the case, including the preparation of her expert report.  Wilson characterizes the $13,222.62 his counsel paid Moore as costs, but given the statutory definition of taxable costs, see 28 U.S.C. § 1920, Wilson's counsel's payments to Moore are more properly placed under the heading of attorneys' fees, see Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2006 (2012) (describing "costs" as "relatively minor, incidental expenses," the assessment of which "often is merely a clerical matter that can be done by the clerk of the court," and that are

distinguishable from "the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators"); see also 42 U.S.C. § 2000e-5(k) (empowering trial court to award, in its discretion, "a reasonable attorney's fee (including expert fees)").

Regarding Moore's role in this case, Wilson characterized her, in his objection to Port City's motion to exclude her expert testimony, as a "Human Resources and legal consultant retained by employers to investigate claims of discrimination and to provide anti-discrimination training to employees."  Doc. no. 52-1, at 6.  Wilson further stated that

> Moore's experience and training as an attorney and as a certified Human Resource consultant provides her with unique and specialized knowledge that will assist the jury in understanding industry standards with respect to how employers implement measures to prevent discrimination in the workplace and how to investigate complaints of harassment.

Id. at 7.

The question of the steps an employer should take to prevent harassment in the workplace is relevant to countering a defendant's assertion of the Faragher-Ellerth defense[5] to a claim that an employee has been subjected to a hostile work environment created by his or her supervisors (a claim that

---

[5] See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus. v. Ellerth, 524 U.S. 742 (1998).

Wilson dropped just before the jury charge).  As Judge DiClerico
has explained, opinions on that topic have no proper place in
supporting a retaliation claim such as the ones on which Wilson
did prevail.  See Cook v. CTC Commc'ns Corp., No. 06-cv-58-JD,
2007 WL 3028415, at *3 (D.N.H. Oct. 15, 2007).  Beyond that,
Moore's opinion was excluded as inadmissible.  Because Moore's
opinion was irrelevant to any claim on which Wilson prevailed
and was unnecessary to the litigation of Wilson's successful
claims, Wilson is entitled to no fees associated with retaining
or working with Moore.  Accordingly, the court excludes from the
lodestar $21,107.62 in attorney's fees devoted Moore's work and
Attorney Broadhead's work with Moore.[6]

Finally, the court notes that at oral argument, Wilson made
the quite plausible suggestion that not all of Moore's work on
this case was directed toward her expert opinions but, rather,
involved her actions as a consultant and/or a general litigation
advisor.  Unfortunately, the billing records Wilson submitted
are not sufficiently detailed to allow the court to distinguish
between fees generated by Moore's role as an expert witness and

---

[6] Port City seeks an exclusion of $21,916.12 for these
categories of work, but approximately 5.4 hours of Attorney
Broadhead's work that Port City identifies as having been
associated with Moore was actually devoted to matters other than
those in which Moore was involved, which makes them compensable.

her role as a litigation consultant.  Because imprecision in the billing records cannot inure to Wilson's benefit, see Burke, 572 F.3d at 63, and because the court cannot just make up a number of hours to assign to Moore's purported role as a litigation consultant, see Torres-Rivera, 524 F.3d at 340, the court is in no position to award fees for Moore's service in such a capacity.

### 2. Wilson's Attorney's Personal Needs

Port City asks the court to exclude from the lodestar $2,282.75 in attorneys' fees generated by the drafting and filing of two motions to continue and one motion to extend a deadline, all of which were necessary to accommodate Attorney Broadhead's personal travel and the birth of his child.

It would be inappropriate for an attorney to bill his or her client for the costs of moving for a continuance or an extension of a deadline necessitated by the attorney's own personal needs.  Thus, in this case, it would be inappropriate to order Port City to pay fees for those services.  See Hensley, 461 U.S. at 434.

The problem here is the amount of time Port City says Wilson's attorneys devoted to the motions at issue.  The

relevant billing records suffer from imprecision resulting from both mixed entries[7] and a general lack of specificity.  As an example of a mixed entry, on March 20, 2014, Wilson's attorneys charged him for 2.5 hours devoted to "[w]ork in file re: omitted pages, telephone conference with Court, telephone conference with opposing counsel and draft continuance."  Pl.'s Mot. for Fees, Rockefeller Aff., Ex. A (doc. no. 101-3), at 21.  Port City asks the court to exclude the entire 2.5 hours as having been devoted to seeking a continuance.  But that cannot be correct, given the entry's inclusion of tasks that bear no identified relationship to seeking a continuance and that must have consumed some of the 2.5 hours.

To solve the problems created by mixed entries, this court adopts a modified version the method outlined by Judge Young in Wilson v. McClure, 135 F. Supp. 2d 66 (D. Mass. 2001).  When confronted with a mixed entry in a case involving compensable "core" and non-compensable "non-core" tasks, Judge Young wrote: "[I]f an attorney spent 12.0 hours on four tasks, three of which were core work and one of which was non-core work, and the

---

[7] A "mixed entry" is one that lists a single number of billable hours for multiple tasks.  See Silva v. Nat'l Telewire Corp, No. 99-219-D, 2001 WL 1609387, at *4 (D.N.H. Dec. 12, 2001).

attorney did not allocate her time among the tasks, this Court would designate 9.0 hours as core hours and 3.0 hours as non-core hours."  Id. at 73.

Judge Young's approach, of course, presumed that each task listed in his hypothetical multiple entry was described in a way that would allow a determination of whether it was a core task or a non-core task.  Here, in addition to the problems resulting from mixed entries, the court faces the problem of tasks that are described too generically to permit the court to discern whether the billed work was compensable or non-compensable. Given the legal principle that billing imprecision may not inure to the benefit of the fee applicant, see Burke, 572 F.3d at 63, the court adjusts Judge Young's method in the following way: when a generic item appears as part of a mixed entry, the court will construe that entry in a way that gives Port City the benefit of Wilson's imprecision.

Turning back to the billing entry quoted above, which identifies four tasks, the first one, "[w]ork in file re: omitted pages," is plainly not directed to obtaining a continuance.  The fourth task, "draft continuance," is self-evidently directed to obtaining a continuance.  The second and third tasks, "telephone conference with Court," and "telephone

conference with opposing counsel," are ambiguous.  As that
ambiguity cannot inure to Wilson's benefit, see Burke, 572 F.3d
at 63, the court presumes that those telephone conferences were
related to the request for a continuance.  Thus, the court
allocates 1.872 of the 2.5 hours billed in the March 20, 2014,
entry to the uncompensable task of seeking a continuance.  After
applying the same method to the remainder of the entries that
Port City links to this task, and eliminating non-mixed entries
such as "[w]ork on file," Pl.'s Mot. for Fees, Rockefeller Aff.,
Ex. A (doc. no. 101-3), at 22, that demonstrate no relationship
to legal work related to accommodating Attorney Broadhead's
personal needs, the court excludes $1,281.25 from the lodestar.

### 3. Preparation for Oral Argument

Port City argues that Wilson's attorneys billed for an
excessive amount of time, 40.33 hours (billed at $6,137),
devoted to preparing Attorney Broadhead for the oral argument on
its motion for summary judgment.  The court agrees.

Of the 40.33 hours of preparation time for which Wilson
seeks fees, 36.83 were billed by Attorney Broadhead.  The
remaining 3.5 hours were billed by Attorney Sarah Lavoie in the
following entry: "Conference with Matthew T. Broadhead,

Christine M. Rockefeller and John E. Durkin[8] re: Attorney
Broadhead's oral argument and review pleadings."  Pl.'s Mot. for
Fees, Rockefeller Aff., Ex. A (doc. no. 101-3), at 23.  Those
40.33 hours of preparation time were in addition to
approximately 80 hours that Attorney Broadhead billed for
researching and drafting Wilson's objection to Port City's
summary-judgment motion.  There is a strong argument to be made
that 80 hours for drafting an objection to summary judgment is
excellent.  See <u>Dixon v. Int'l Bhd. of Police Officers, 434 F.
Supp. 2d 73, 82 (D. Mass. 2006)</u> (ruling that 32.8 hours for
opposing summary-judgment motion was excessive, and awarding
fees for 20 hours of work on that task).  But, Port City does
not challenge the 80 hours billed in this case, and the court is
not inclined to give Port City an argument it has not made.
Still, approximately 40 hours to prepare for a hearing on a
motion that Wilson had already devoted 80 hours to opposing
seems too much.  In light of all the work that went into

---

[8] John E. Durkin is a personal friend and is on my recusal
list.  Prior to this mention of Attorney Durkin's name, I had no
knowledge that he was in any way involved in this case.  The
billing records also mention two other conferences in which
Attorney Durkin was a non-billing participant.  Wilson is not
seeking any fees for Attorney Durkin's participation in any of
those conferences, nor does Wilson attempt to use Attorney
Durkin's involvement to lend credibility to his request for
fees.  I have concluded that these three references to Attorney
Durkin do not raise any concerns regarding either my actual bias
or the appearance of bias.

preparing the written objection to Port City's summary-judgment motion, it is reasonable to award Wilson fees for another 20 hours of work, at Attorney Broadhead's rate of $150 per hour, to prepare for the hearing.  That results in a reduction of the lodestar by $3,137.

To sum up, the court excludes $25,525.87 from the lodestar due to billings for excessive and/or unnecessary work associated with: (1) Julie Moore; (2) accommodating Attorney Broadhead's personal schedule; and (3) opposing Port City's summary-judgment motion.

C. Claims against Jesurum, Denney, and Clark

In both his original complaint and his first amended complaint, Wilson asserted four claims against Robert Jesurum,[9] four claims against Ned Denney,[10] and one claim against Adam Clark.[11]  Judge DiClerico dismissed the claims against Jesurum and Denney, for failure to state a claim on which relief can be

---

[9] Those four claims, brought under RSA 354-A, include a hostile-work-environment claim (Count XII), a disparate-treatment claim (Count XV), and retaliation claims based upon two different incidents of protected conduct (Counts XIII and XIV).

[10] Those four claims, brought under RSA 354-A, include a hostile-work-environment claim (Count XVI), a disparate-treatment claim (Count XIX), and two retaliation claims (Counts XVII and XVIII).

[11] The claim against Clark, Count XX, was for creating a hostile work environment.

granted, see Fed. R. Civ. P. 12(b)(6), and I dismissed the claim against Clark on the same grounds.  The essential basis for all three dismissals was that none of the three individual defendants was Wilson's employer, and RSA 354-A only provides for liability against employers.

Wilson seeks $11,058 in attorney's fees related to prosecuting his claims against Jesurum, Denney, and Clark.  Port City asks the court to exclude those fees from the lodestar, as unnecessary, or to adjust the lodestar by deducting those fees from it, due to Wilson's lack of success on his claims against those defendants.  Under either analytical approach, the court agrees that Wilson is not entitled to the fees at issue.

The court is unable to articulate any reason why it would be reasonable to make Port City pay attorneys' fees generated by Wilson's failed claims against Jesurum, Denney, and Clark.  To be sure, there are legal principles that can, under the proper circumstances, support an award of fees for a plaintiff's unsuccessful prosecution of a claim that was interconnected with a successful claim against the same defendant.  See Hensley, 461 U.S. at 435.

But here, if Wilson had prevailed on his claims against Jesurum, Kenney, or Clark, he might be entitled to fees from those defendants, but he could not collect fees from Port City

on account of his success against the individual defendants.  If
Wilson could not collect fees from Port City after prevailing
against Jesurum, Kenney, or Clark, he surely cannot collect fees
from Port City after losing his claims against those three
defendants.  Cf. Burke, 572 F.3d at 63 (affirming district
court's decision to exclude from the lodestar fees generated by
prosecuting "unsuccessful claims, each of which was made against
other defendants [i.e., defendants other than the one who was
liable for attorneys' fees], premised on significantly different
legal theories, or both").  The court's denial of fees for
pursuing claims against the three individual defendants is
further warranted by the fact that the only issue on which
Wilson engaged with those three defendants, i.e., whether an
employee can bring a claim against a fellow employee under RSA
354-A, is entirely unconnected to any issue that Wilson
litigated or could have litigated against Port City.

    As for the amount of fees that must be deducted from the
lodestar, the court uses the same analytical framework it
employed in Section III.B.2.  Based upon that analysis, the
court deducts from the lodestar the $9,134.50 in attorneys' fees
that were generated by Wilson's pursuit of claims against
Jesurum, Denney, and Clark.

D. Adjustment to the Lodestar

In his motion for fees, and in reliance upon Díaz-Rivera v. Rivera-Rodríguez, 377 F.3d 119 (1st Cir. 2004), Wilson argues that he is entitled to the entire lodestar because he prevailed on some of his claims, and all the claims he asserted, both successful and unsuccessful, arose out of a common core of facts and related legal theories. In Díaz-Rivera, the court of appeals affirmed the district court's decision to reduce the lodestar by 33 percent, on account of the plaintiff's lack of success on some of his claims. See 377 F.3d at 127. The court of appeals explained its decision this way:

> The district court's rationale for [reducing the lodestar by 33 percent] is indicated by its citation to Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1191 (1st Cir. 1996), in which this court summarized the Supreme Court's holding in Hensley:
>
>> Hensley makes clear that where multiple claims are interrelated and a plaintiff has achieved only limited success, awarding her the entire lodestar amount would ordinarily be excessive.
>
> Id. at 1191.

Díaz-Rivera, 377 F.3d at 126. Thus, Díaz-Rivera does not support Wilson's argument that he is entitled to an award of fees equaling an unadjusted lodestar.

Rather, as the Supreme Court explained in Hensley, a fully compensatory fee should be awarded "[w]here a plaintiff has

23

obtained excellent results." 461 U.S. at 435 (emphasis added).
Here, while Wilson did prevail on two claims, he did not obtain
excellent results, given the 18 claims on which he did not
prevail and the difference between the approximately $410,000 in
damages he identified in his pre-trial statement and the $15,000
he ultimately recovered.  By any objective measure, Wilson's
success was "limited in comparison to the scope of the
litigation as a whole." Central Pension, 745 F.3d at 7
(citation omitted).  Thus, a downward adjustment of the lodestar
is warranted.  The process of adjustment, in turn, is guided by
the Hensley factors.

    In the discussion that follows, the court begins with an
analysis of the preeminent Hensley factor, results obtained,
which itself has three distinct components: claim-by-claim
success, proportionality, and societal importance.  This
discussion concludes with an analysis of the second and third
Hensley factors, i.e., novelty and difficulty (factor 2) and
skill required (factor 3).  Neither party has addressed any of
the remaining Hensley factors, and so the court trains its focus
on those factors on which either or both of the parties have
engaged.

## 1. Results Obtained: Claim-by-Claim Success

In his motion for fees, Wilson has properly documented his claim, and has made a plausible assertion that the time claimed is not amenable to allocation between claims that were successful and claims that were not.  See Burke, 572 F.3d at 63. Thus, with respect to this aspect of the results-obtained factor, Port City has the burden of showing that there is a basis for segregability.  See id.  It has not carried that burden.

On the side of finding Wilson's claims not to be segregable, Wilson's hostile-work-environment claims and his retaliation claims, which arose in part from a formal complaint about his work environment, involve a set of common facts, i.e., the facts concerning Wilson's work environment.  While Wilson did not have to prove an actionable hostile work environment to prevail on his retaliation claim, see Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 26 (1st Cir. 2012) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991)), there can be no denying that offering evidence on that environment substantially assisted the jury in making an informed decision on the retaliation claims.  Thus, Wilson's hostile-work-environment claims and his retaliation claims are not "largely independent."  Diaz, 741 F.3d at 173 (finding that

25

successful claims under Federal Age Discrimination in Employment
Act and Massachusetts antidiscrimination law were segregable
from claims for violating Massachusetts Civil Rights Act,
wrongful termination, intentional infliction of emotional
distress, and defamation).   That supports an argument against
segregation.   Cf. Rand v. Town of Exeter, N.H., No. 11-cv-55-LM,
2014 WL 4922977, at *10 (D.N.H. Sept. 30, 2014) (declining to
deduct from the lodestar fees that Title VII plaintiff incurred
in prosecuting assault claim against Town employee, where
successful retaliation claim arose from complaints about the
assault).  Moreover, while Port City correctly points out that
Wilson prevailed on only one of his three retaliation theories,
it is also the case that all of Wilson's retaliation claims were
based on the very same legal theory, which also supports an
argument against segregation.  See Hensley, 461 U.S. at 435.

     Port City's strongest segregability argument is that
because it never challenged the "protected conduct" element of
Wilson's retaliation claims, legal work directed to the alleged
hostile work environment had nothing to do with the retaliation
claims.[12]  That argument is not persuasive, because: (1) the

---

     [12] Port City's argument goes like this.  To prove a
retaliation claim, a plaintiff must show that he engaged in
protected conduct.  See Garayalde-Rijos v. Mun'y of Carolina,
747 F.3d 15, 25 (1st Cir. 2014).  Protected conduct, in turn,
includes opposing unlawful discrimination, such as allowing a

primary protected conduct to which Port City refers in its memorandum of law is Wilson's internal complaint rather than his HRC charge; and (2) while Port City accurately reports that the protected-conduct element of Wilson's retaliation claim was taken from the jury, he has not shown that that element was conceded, vis à vis Wilson's retaliatory-suspension claim, at a point early enough in the litigation process to render legal work on the hostile-work-environment claims entirely unconnected to the retaliation claims.

To sum up, Port City has not carried its burden of showing a basis for segregating Wilson's unsuccessful discrimination and retaliation claims from his successful retaliation claims. Still, he prevailed on only two of the 20 claims he originally brought, and only two of the 11 he took to trial.  Thus, even without showing a basis for segregability, Port City has established that it is entitled to some downward adjustment in the lodestar, due to Wilson's lack of success.  See Díaz-Rivera, 377 F.3d at 126 ("where multiple claims are interrelated and a plaintiff has achieved only limited success, awarding her the

_____

hostile work environment to exist.  See id.  When a defendant concedes that a plaintiff has established the protected-conduct element, the plaintiff has no need to demonstrate that the conditions he opposed amounted to unlawful discrimination. That, in turn, renders legal work directed toward those conditions irrelevant, segregable, and uncompensable.

entire lodestar amount would ordinarily be excessive") (quoting Andrade, 82 F.3d at 1191).  The court addresses the amount of that adjustment in Section III.D.5.

### 2. Results Obtained: Proportionality

There is substantial disproportionality in this case. Wilson initially sought more than $200,000 in costs and fees, and even after the deductions described above, the lodestar still stands at a little over $167,000.  That is a large fee for a recovery of $15,000.  Even more disproportionate is the amount of Wilson's recovery in comparison with the $410,000 in damages he sought.  That disproportionality supports, but does not compel, a downward adjustment of the lodestar.  See Central Pension, 745 F.3d at 7 (declining to hold that the district court abused its discretion by adjusting the lodestar downward from $84,656.50 to $18,000 where plaintiff recovered $26,897.41 of the $200,000 in damages it claimed, and sought $143,600.44 in attorneys' fees for its recovery of $26,897.41); but see Diaz, 741 F.3d at 179 (rejecting argument that trial court committed legal error by failing to make award of attorney's fees strictly proportional to award of damages and affirming district court's award of more than $100,000 in attorneys' fees in case where jury awarded less than $10,000 in damages).

### 3. Results Obtained: Societal Importance

Finally, the societal importance of the right Wilson vindicated is considerable.  He might not have been the paradigmatic "private attorney general" who brings claims under 42 U.S.C. § 1983 against a person acting under color of state law, but he was not far off.  Plainly, the value of his victory over Port City extends beyond his own personal interests and the money judgment he received.  Cf. Diaz, 741 F.3d at 178-79 (explaining that societal importance of plaintiff's success on state-law discrimination claim was established by district court's "substantial order clarifying the stray remarks doctrine . . . as well as a published First Circuit opinion holding that mixed-motive analysis applies to Massachusetts age discrimination claims").  Here, Wilson received a judgment that Port City treated him unlawfully, a judgment that put Port City on notice that it cannot treat other employees the way it treated Wilson.  And, given that Wilson's successful retaliation claims arose from actions Port City took in response to the charge he filed with the HRC, his victory has the added value of encouraging others similarly situated to file charges with the HRC without fear of retaliation.  That extends the value of his

victory to workers beyond the confines of Port City,[13] and well beyond the amount of his money judgment.  Indeed, of all the claims that Wilson brought against Port City, the retaliation claim based upon his filing a charge with the HRC has the broadest societal reach of all.  That societal reach, in turn, in conjunction with the Title VII fee-shifting provision, places the right that Wilson vindicated squarely within the realm of "polic[ies] that Congress considered of the highest priority." Fox v. Vice, 131 S. Ct. 2205, 2213 (2011) (quoting Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 (1968)).  Thus, the societal importance of the right Wilson has vindicated weighs in favor of limiting the downward adjustment of the lodestar.

### 4. Hensley Factors Two & Three

Having addressed the preeminent Hensley factor, results

---

[13] In dictum in Blum v. Stenson, the Supreme Court expressed disbelief "that the number of persons benefited is a consideration of significance in calculating fees under [42 U.S.C.] § 1988," 465 U.S. 886, 900 n.9 (1984) (emphasis in the original), because "[p]resumably, counsel will spend as much time and be as diligent in litigating a small class of people, or, indeed, in protecting the civil rights of a single individual," id.  But, the Court made that statement in a case in which the plaintiff sought attorney's fees in excess of the lodestar, rather than in a case such as this one, in which the question before the court is how much to reduce the lodestar. Thus, in Blum, the court's concern was avoiding an impermissible windfall to the plaintiff's attorneys, see Perdue, 559 U.S. at 552, while in this case, the court's concern is giving competent attorneys an adequate incentive to prosecute meritorious claims such as the ones on which Wilson prevailed.

obtained, the court turns to the second and third factors,
novelty and difficulty of the questions litigated, and the skill
required to litigate those questions properly.  Wilson points
out that this was a complex case.  While there was not much
novelty in Wilson's retaliation claims, the court can readily
agree that Title VII in general, Title VII retaliation, and the
embedded issue of pretext are complex areas of the law which
require considerable skill to litigate properly.  However, the
second and third Hensley factors are already reflected in the
reasonable hourly rate, see Perdue, 559 U.S. at 553 (citing Blum
v. Stenson, 465 U.S. 886, 898 (1984); Pennsylvania v. Del.
Valley Citizens' Council for Clean Air, 478 U.S. 546, 566
(1986)), and, as result, should have no bearing on any
adjustment that must be made to the lodestar, see Perdue, 559
U.S. at 553 (citing City of Burlington v. Dague, 505 U.S. 557,
562 (1992); Pennsylvania v. Del. Valley Citizens' Council for
Clean Air, 483 U.S. 711, 726-27 (1987); Blum, 465 U.S. at 898).

### 5.  Amount of the Downward Adjustment

Given the exclusions and deductions the court has already
made, the pre-adjustment lodestar stands at $167,223.95.  Port
City argues that the court should adjust the lodestar downward
by 90 percent to $16,722.40, based upon Wilson's having

prevailed on only two of the 20 claims he originally brought.
The court disagrees.

In the first place, fees for nine of Wilson's original 20
claims have already been deducted from the lodestar in Section
III.C.  Port City is not entitled to have those fees deducted a
second time.  Cf. Diaz, 741 F.3d at 179.  But, more importantly,
the Supreme Court has expressly indicated its disapproval of
Port City's approach:

> We agree with the District Court's rejection of
> "a mathematical approach comparing the total number of
> issues in the case with those actually prevailed
> upon."  Such a ratio provides little aid in
> determining what is a reasonable fee in light of all
> the relevant factors.

Hensley, 461 U.S. at 435 n.11 (citation to the record omitted).

Accordingly, the court proceeds down a different path, one
that involves a balancing of Wilson's limited success on a
monetary basis against the societal importance of the claims on
which he prevailed.  The court conducts that balancing test in
light of its "intimate knowledge of the nuances of the
underlying case." Díaz-Rivera, 377 F.3d at 124 (quoting Gay
Officers, 247 F.3d at 292) (affirming 33 percent reduction in
attorneys' fees where plaintiff prevailed on due-process claim,
lost on First Amendment claim, and recovered nominal damages).
Here, for the reasons discussed more fully above, the court
gives significant weight to the societal importance of the right

to be free from retaliation that was vindicated by Wilson's
success against Port City, and concludes that Wilson is entitled
to $112,000 in attorneys' fees.

### IV. Conclusion

For the reasons described above, Wilson's motion for
additur or a new trial on damages, document no. 102, is denied,
and his motion for attorneys' fees and costs, document no. 101,
is granted in part.  Based upon the foregoing analysis, he is
entitled to, and the Port City shall pay him, $112,000 in
attorneys' fees and $4,339.89 in costs.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

December 19, 2014

cc:  Matthew T. Broadhead, Esq.
     Jacob John Brian Marvelley, Esq.
     Paul McEachern, Esq.
     Christine M. Rockefeller, Esq.